UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert P. ADCOCK, Jr.,
Defendant-Appellant.

No. 80–5607.

United States Court of Appeals,
Fifth Circuit.

Unit B

July 20, 1981.

H. Jay Stevens, Asst. Federal Public Defender, Orlando, Fla., for defendant-appellant.

Joseph T. Urbaniak, Jr., Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before TUTTLE, RONEY and ANDERSON, Circuit Judges.

TUTTLE, Circuit Judge:

■ This is an appeal from convictions of three counts for possession and delivery of counterfeit federal reserve notes in violation of 18 U.S.C. § 472 and 473 and two counts of an indictment for the obstruction of a criminal investigation in violation of 18 U.S.C. § 1510. The two indictments were joined for trial. The only grounds of appeal that will merit discussion deal with the admission by the trial court of two statements testified to by other witnesses as having been made by the defendant Adcock. In order to test the admissibility of these two statements under some exception to the hearsay rule, it is necessary to outline proof in the light most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), *reh. denied* 315 U.S. 827, 62 S.Ct. 629, 86 L.Ed. 1222.

A jury could have believed the following facts as testified to by Government witnesses.

(A) Adcock, defendant-appellant, is charged in the first indictment, with one count (Count I) for possession of 18 counterfeit federal reserve notes and one count (Count II) for delivery of those notes to Gary Stillings.

On December 22, 1979, Gary Stillings and Robert Adcock met at a motel in Winter Park, Florida, according to an agreement they had reached earlier in the day whereby Adcock had agreed to pay Stillings $380.00 for a pound of marijuana. Adcock was in the motel room when Stillings arrived, and the two smoked some of Stillings' marijuana. Adcock then produced a bank bag full of money which Stillings thought was counterfeit. Stillings testified that he told Adcock that he did not want to be paid with counterfeit money. The two continued discussions over a few drinks, some more marijuana and some cocaine and Adcock told Stillings he could pass the counterfeit bills at volume business retail establishments and age the counterfeit bills by rubbing them between newspaper. Stillings left with $380 in counterfeit bills (nineteen $20 bills).

When Stillings was unsuccessful in his attempt to pass one of the bills, he hid the money. Then he made a phone call anonymously to the Secret Service to find out whether a citizen could get real money for turning in bogus money. Agent Don Stebbins told Stillings that he could not get real money and asked Stillings to identify himself. Stillings refused to do so. Several days later, Stillings called Stebbins and agreed to turn over the counterfeit money to him. When they met, Stillings turned in the counterfeit money except for one $20 federal reserve counterfeit note which he kept and subsequently lost.

(B) Count III of the first indictment charged Adcock with the delivery of one counterfeit $20 federal reserve note to Robbie Campbell at the ABC Lounge in Casselberry, Florida.

On New Year's Eve, Campbell ran into Adcock and another individual at the ABC Lounge. The barmaid was unable to change Campbell's $50 bill when he tried to pay her for drinks so Adcock gave Campbell two $20's and one $10 for the $50. Later that evening, after Campbell had unsuccessfully attempted to use the remaining $20 to pay for drinks, a Casselberry police officer determined that it was a counterfeit bill. A few days later, Adcock approached Campbell at the ABC Lounge and asked him to give someone $1,000 in $20 bills. Campbell took the money. Later he noticed the bills were counterfeit so he gave Adcock back the $1,000, telling Adcock he did not want to take counterfeit money. Adcock denied that it was counterfeit.

(C) Appellant was charged in Count I of the second indictment with obstructing an official investigation by threatening Gary Stillings.

During January, Adcock and a six-foot-five, 250 pound companion, Larson, went to the home of Stillings' brother, David, where Gary lived. Failing to find Gary Stillings there, they told David that Gary was a

"dead man" if he testified for the Secret Service. Stillings was frightened by the incident, called the Secret Service, and asked a friend, Marty Cohen, to move in with him for protection. Later Adcock and Larson approached Gary Stillings at the ABC Lounge where he was dancing with a lady. They grabbed him, escorted him outside and told him that they were going to fix him so he could never speak to the Secret Service again. They forced him inside a van where Larson placed a gun in his lap and told him that he hoped he realized they meant business.

Marty Cohen worked out an agreement with Adcock and Larson whereby the latter two agreed to leave David alone and David's friends would not avenge any action taken by Adcock on Gary Stillings. After Adcock had told Cohen that breaking Gary's leg would not be sufficient to prevent him from testifying he implied that it would be necessary for his mother to find him dead alongside of the road.

(D) Appellant was charged in Count II of the second indictment with obstructing an official investigation by threatening Robert Campbell if he testified against him.

On January 23, 1980, Robert Campbell was at the Sheraton Inn when Adcock approached him and requested to have a discussion with him in a room on the backside of the motel. Once within the room, Adcock told Campbell that there were some people who were very upset with Campbell and wanted to hurt him for having spoken to the Secret Service. The conversation ended when Adcock received a phone call, but not before Campbell felt intimidated and threatened by Adcock's actions. Adcock called Campbell later on two occasions and once explicitly told him that "he would have someone brought in to take care of everybody that testified against him, including Gary."

## THE OBJECTIONS TO EVIDENCE

(A) Adcock took the stand and denied that he had known that the federal reserve notes were counterfeit and he undertook to explain away the telephone conversations and other damaging statements relative to threats. Under cross-examination, in response to the question by the prosecuting attorney, "when is the last time you talked to Mr. Campbell?" he answered, "yesterday" and in response to the question, "and what was the conversation you had with him?" he answered, "Hi, Robbie, how are you doing?" In point of fact, Adcock had accosted Campbell in the men's restroom the previous day during the trial and had said to him that his testimony "was hurting him, killing him, that my [Campbell's] testimony was hurting him." This testimony, given by Campbell after the Government had recalled Adcock to the witness stand to attempt to get him to confirm it, is the basis of the first of the two objections to the admission of evidence with which we deal.

(B) During the cross-examination of the defendant, the Government questioned him about conversations he had had with Agent Robert Connelly of the Secret Service. The following exchange took place:

Q: Okay. Did you—do you ever recall telling him, there's going to be a lot of people get hurt?

A: That's quite possible that I said that. A lot of people were being hurt; my business associates, my family.

Q: Okay. Let me ask you this, do you recall Mr. Connelly advising you in response to that that the Secret Service would take whatever measures were necessary to ensure the safety of any witnesses in their investigation?

A: Sir, their safety was never a concern. There were no physical threats made or—

THE COURT: Now just a minute. That isn't the question that was asked. Read the question. State your question again, and you answer the question.

BY MR. URBANIAK:

Q: Do you recall Mr. Connelly advising you that the United States Secret Service would take whatever measures were necessary to ensure the

safety of any witnesses in their investigation?

A: I don't recall that being said.

Q: Okay.

A: It's possible that it was.

Q: Do you recall you answering to Mr. Connelly, "You all can't help everyone"?

A: Since they were obviously hurting me and members of family as well, and friends, that's quite possible that I said that.

The Government then called Agent Connelly in rebuttal. Agent Connelly testified that on February 14, 1980, he was called on the telephone by the defendant. His testimony, objected to by the defendant, follows:

A: Mr. Adcock said, "What are you trying to do to me?"

MR. STEVENS: Your Honor, again this is not impeachment material. I would object and move to strike.

THE COURT: Overruled.

THE WITNESS: "I thought this thing was over with" he said, "Are you going to get me indicted by the Grand Jury?"

I advised Mr. Adcock that we had nothing personal against him. We were conducting an ongoing investigation, and that I was not at liberty to discuss with him our investigation.

Q: Did he say anything after that?

A: Yes, sir, he did. He said there were going to be a lot of people get hurt. I told Mr. Adcock that was a foolish statement to say, and that the Secret Service would take whatever measures were necessary to protect any of the witnesses.

Q: Excuse me, I'm sorry.

A: Mr. Adcock then said, "You can't— you can't protect them all." And at that point I terminated the conversation.

When Connelly was cross-examined he conceded that he had said in his concluding statement "you all can't 'help' everyone."

The admission of this testimony is the basis of the second ground of appeal with which we deal.

## THE CAMPBELL TESTIMONY

The appellant contends that the admission of Campbell's restroom testimony was improper, because it was useful only for the purpose of bolstering the testimony of the Government witness, Stebbins, and that its admission would violate the provisions of Rule 403, F.R.Evid. because even if relevant, its probative value would be substantially outweighed by the danger of unfair prejudice.

While appellant frankly concedes that he is unable to find any case in this or any other Circuit which deals with the precise point in question, i. e., whether the defendant's opinion of the weight of the testimony can be properly presented to the jury solely to comment on the weight of the evidence, he cites us to *U. S. v. Garza*, 608 F.2d 659 (5th Cir. 1979). In the *Garza* case, the court criticized a prosecutor's closing remarks which the court found to have been for the purpose of giving added credibility to the prosecutor's witnesses. In that case, we said:

A criminal trial provides a neutral arena for the presentation of evidence upon which alone the jury must base its determination of a Defendant's innocence or guilt. Attorneys for both sides, following rules of evidence and procedures designed to protect the neutrality and fairness of the trial, must stage their versions of the truth within that arena.

608 F.2d at 662.

The Government responds by taking the broad position that *any* statement by the accused in a criminal case which is not explicitly barred "by the doctrine of confessions or by the privilege against self-incrimination, is usable against him as an admission," citing *United States v. Rouse*, 5 Cir., 452 F.2d 311 (1971). The language of the *Rouse* case supporting the Government's contention is "as stated by Wigmore, 'any and every statement of an accused person, so far as not excluded by the doctrine of

confessions ... or by the privilege against self-incrimination ... is usable against him as an *admission'* ...." 6 Wigmore Evid. § 1732, p. 99 (3d ed. 1940). It is doubtful that the statement was intended by this Court or by Wigmore as broadly as the Government here contends. That is to say, we assume that in the *Rouse* case we meant to say that if, in fact, from the statement a jury could reasonably infer that the accused was *admitting* some element of the offense, then the statement was admissible against him as an admission. We do not construe the language of the opinion in *Rouse* as saying that any statement made by an accused, even though it could not possibly be construed as admitting any element of the offense charged, could nevertheless be received against him as an admission.

■ Here, the statement made by Adcock that Campbell's testimony was "killing" Adcock could not be construed by a jury as an admission by Adcock of any of the elements of the offense. It could, of course, be construed as an admission by Adcock that what Campbell was testifying to was really very harmful to him. At the commencement of the trial, the trial court had invoked "the rule," that is, he had instructed all witnesses in the case to refrain from discussing the case with anyone else and from letting anyone discuss the case with them. When the defendant accosted the witness Campbell in the restroom and told him his testimony was "killing" Adcock, the latter knew he was causing Campbell to violate the court's specific instructions. Such a comment may have been intended by Adcock to be a continuation of the threat he had made to Campbell earlier —"I told you we would have someone brought in to take care of everybody who testifies" against me, and, now Adcock approaches Campbell and tells him not only that he has testified against Adcock, but that his testimony is "killing" Adcock. If it was such a continuation of the threat, it would be admissible even though it occurred months after the original threat. In any event, it hardly seems open to Adcock to object to introduction into evidence of a conversation he started in violation of the

court's order, especially one apparently designed to have such a chilling effect on the witness. We conclude that it was not error for the court to admit the statement.

### THE CONNELLY TESTIMONY

■ It is difficult to understand the basis for appellant's challenge to the admissibility of Connelly's testimony relative to the telephone call made to him on February 14 by Adcock. The court already having received substantial evidence of threats by Adcock against both Stillings and Campbell as potential witnesses, it would seem quite relevant for the court to admit evidence of Adcock's own repetition of the threat to the Secret Service agent to prove the element of intent necessary for a conviction under the obstruction statute. Here is a man who, according to other testimony, had told Campbell that "there were going to be a lot of people hurt" and "he would have someone brought in to take care of everybody that testified against him, including Gary" who now calls the Secret Service agent himself and repeats the statement "there were going to be a lot of people get hurt." Then, in response to Agent Connelly's statement "that was a foolish statement to say, and that the Secret Service would take whatever measures were necessary to protect any of the witnesses," Adcock replied "you all can't help everyone."

The statement made by Mr. Connelly that the Secret Service would take whatever measures were necessary to protect all the witnesses could not be converted by Adcock into something different merely because he responded by saying: "You all can't help everyone." The defendant's original statement that "there were going to be a lot of people get hurt" was construed by Connelly as being a threat to the safety of the witnesses. His answer makes this plain. He said "the Secret Service would take whatever measures were necessary to protect any witnesses." We conclude that the jury could properly make the same inferences from the language as did the person to whom the call was made. The trial court

permitted the introduction of this evidence as proof of the intent back of the original threat. We think it did not err in doing so.

## OTHER OBJECTIONS

Appellant does not complain of the lack of sufficient evidence to convict with respect to either of the indictments. He bases his complaint upon the trial court's errors in the admission of the two statements already referred to and to the court's admission of evidence as to Adcock's negotiating a purchase of marijuana from one of the witnesses. The trial court gave proper cautionary instructions with respect to such evidence, and we agree that since the counterfeit bills were transferred in payment of the marijuana purchase, no error was committed.

Appellant's general contention that these several bits of evidence which were admitted should have been excluded under Rule 403 of the Federal Rules of Evidence is not well taken. Necessarily, the rule that even though relevant, evidence may be excluded "if its probative value was substantially outweighed by the danger of unfair prejudice" must contemplate a careful weighing by the trial judge of the threatened danger of unfair prejudice. As we have stated in *United States v. Frick*, 588 F.2d 531 (5th Cir. 1979), "a trial judge's ruling under Rule 403 may be reversed only if there was a clear abuse of discretion. *U. S. v. McDaniel*, 574 F.2d 1224, 1227 (C.A.5 1978); *U. S. v. Grimm*, 568 F.2d 1136, 1138 (C.A.5 1978); *U. S. v. Brown*, 547 F.2d 1264, 1266 (C.A.5 1977)." Here, we find no such abuse of discretion.

The judgment is AFFIRMED.