# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 21, 2013

No. 11-10865

Lyle W. Cayce
Clerk

ALBERTO SIFUENTES; JESUS RAMIREZ,

Plaintiffs - Appellants

v.

SALVADOR ABREO; THE CITY OF LITTLEFIELD, TEXAS;
LEONEL PONCE,

Defendants - Appellees

---

JESUS RAMIREZ,

Plaintiff- Appellant

v.

SALVADOR ABREO; THE CITY OF LITTLEFIELD, TEXAS;
LEONEL PONCE,

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 09-00190

No. 11-10865

Before JOLLY, BENAVIDES, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

This is an appeal from a take nothing judgment in a 42 U.S.C. § 1983 suit. The two Plaintiffs-Appellants, Alberto Sifuentes and Jesus Ramirez ("the Plaintiffs") had previously been convicted of murder and sentenced to life in prison in Texas. Ultimately, the Texas Court of Criminal Appeals granted the Plaintiffs habeas relief based upon the claim of ineffective assistance of trial counsel. Thereafter, the Plaintiffs brought this 42 U.S.C. § 1983 suit alleging several constitutional violations against the City of Littlefield, Lamb County and various law enforcement officials involved in the investigation and prosecution of the murder case. After more than five weeks of trial, the jury found for the Defendants on all counts. The Plaintiffs-Appellants appeal, arguing that the district court erred by allowing the Defendants' counsel to question the witnesses in such a way as to attempt to portray the Plaintiffs as "illegal aliens" at the time of their arrests even though they both had lawful permanent resident cards during the time relevant to their damages claim for lost earnings. Finding no reversible error, we AFFIRM.

I. FACTUAL AND PROCEDURAL HISTORY

The instant § 1983 lawsuit was filed in 2009. However, the suit stems from a murder that occurred on August 6, 1996. At that time, the victim, Evangelina Cruz, was working at a Jolly Roger convenience store in Littlefield, Texas. Two men robbed the store and fatally shot Cruz. Subsequently, Sifuentes and Ramirez were charged with and convicted of Cruz's murder and sentenced to life imprisonment in two separate trials.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

No. 11-10865

After their convictions were affirmed on direct appeal, they pursued state habeas relief, and the state trial court ruled that they had received ineffective assistance and recommended granting the writ on that claim. The state trial court did not recommend granting relief on their claims of unconstitutional conduct on the part of the instant Defendants and their claim of actual innocence. In two very short opinions, the Texas Court of Criminal Appeals granted habeas relief based on trial counsel's rendering ineffective assistance for failure to investigate alibi witnesses and alternative suspects; however, it did not reach the remaining claims.[1] The murder case was again presented to a Lamb County grand jury, which declined to charge them. Sifuentes and Ramirez were released from custody in 2008, after nearly twelve years of incarceration.

Sifuentes and Ramirez ("the Plaintiffs") filed the instant § 1983 suit on April 27, 2009,[2] against Texas Ranger Salvador Abreo, Police Officer Leonel Ponce, and the City of Littlefield, Texas.[3] The Plaintiffs alleged, among other things, that the Defendants denied their right to a fair trial in violation of the Fourteenth Amendment and wrongfully arrested and incarcerated them without probable cause in violation of the Fourth and Fourteenth Amendments. The Plaintiffs also alleged that the City of Littlefield had a policy of employing improper eyewitness identification procedures and failed to train or supervise its officers with respect to proper eyewitness identification procedures.

Six months prior to trial, the Plaintiffs moved to exclude any evidence regarding their pre-arrest immigration status or history. The Plaintiffs argued that because they were lawful residents at the time of their arrests, such

---

[1] *Ex parte Sifuentes*, No. AP-75815, 2008 WL 151087 (Tex. Crim. App. Jan. 16, 2008); *Ex parte Ramirez*, No. AP-75816, 2008 WL 151128 (Tex. Crim. App. Jan. 16, 2008).

[2] The complaints were filed separately but they were subsequently consolidated.

[3] The Plaintiffs also filed suit against Mark Yarbrough, the District Attorney for Lamb County, and Lamb County, Texas. Those Defendants are not parties to this appeal.

evidence was irrelevant and prejudicial. The Defendants opposed the motion, asserting that such evidence was relevant and probative. The district court denied the motion. Shortly before trial, Plaintiffs again filed a motion in limine to exclude evidence of alien status. In that motion, Plaintiffs requested the court to instruct the Defendants to refrain from referencing the Plaintiffs' immigration status without first approaching the bench and obtaining a ruling from the district court outside the presence of the jury. Once again, the Defendants opposed the motion, and the district court denied it.

At trial, testimony with respect to the Plaintiffs' illegal immigration status was elicited from the following three witnesses: the Plaintiffs; Ramirez and Sifuentes; and Dr. Bradley Ewing, the Plaintiffs' economist expert witness.[4] Both Plaintiffs testified using an interpreter.

### Ramirez's testimony

During direct examination of Ramirez, his attorney elicited that Ramirez was born in Mexico and that in 1975 he was stopped by immigration officials and returned to Mexico when he attempted to enter the United States. Ramirez also testified that he was a lawful permanent resident of the United States and had a permanent resident card.[5]

On cross examination, defense counsel asked Ramirez if his green card was dated December 1, 1990 because he received it "through an amnesty program for people who were previously here illegally." Ramirez responded "yes." Defendants' counsel then inquired whether his current lawyers assisted

---

[4] Additionally, we note that, during voir dire, a potential juror inquired as to the Plaintiffs' immigration status, and Plaintiffs' counsel responded that the Plaintiffs were here lawfully.

[5] Plaintiffs' counsel stated that he wanted to show the jury the card, and the district court responded that it was "not sure why we are taking the time to do that" because Ramirez "testified he has got the green card. He is a permanent resident." Apparently due to the court's response, counsel did not introduce the card at that point in time.

No. 11-10865

him in obtaining the card, and Ramirez responded that he "already had another card, but it expired while in the penitentiary." Defendants' counsel reiterated that the "Haynes & Boone lawyers helped you get [the green card], didn't they?" Defendants' counsel further asked if he first met the Haynes & Boone lawyers in 2001 after he had already been convicted of murder. Ramirez answered affirmatively. Defendants' counsel further inquired as follows: "Now, you say that you had a green card before 2001, but do you have any proof of that?" Ramirez replied that "I don't have it with me here but I do have proof of the other card." Defendants' counsel then asked whether Ramirez went to prison as an illegal alien in 1998, and he responded "No, I still had my other card," but it expired while he was in prison. Plaintiffs' counsel objected to the questioning based on its relevance and asserted it was prejudicial. The district court overruled the objection. Defendants' counsel then inquired whether the Texas prison system classified him as an illegal alien, and Ramirez responded affirmatively. Defendants' counsel asked if Ramirez had informed the prison of his green card, and Ramirez responded that "once one enters the penitentiary, one loses all of your rights."

Defense counsel asserted that Ramirez "still didn't have a green card even as late as 2008 when you got out of prison, did you?" Ramirez stated that he "had a card from before I went to prison. It's in the records from when I paid my taxes every year." Counsel responded by asking "you know that some people who are here illegally use false Social Security numbers?" Ramirez asked counsel to repeat the question. Instead of repeating the question, counsel insisted again that Ramirez "didn't have those papers until 2009, did you?" To which Ramirez answered: "How was I going to have them if I was in the penitentiary?" Plaintiffs' counsel again objected as to relevance, stating that he had tried to introduce the card yesterday. The court stated "we probably need to move on." Defendants' counsel asked the court if it could ask another

question, and the court allowed it.  Pointing to Ramirez's deposition testimony that he did not have his papers when he was released from prison in 2008, counsel asked Ramirez whether he knew "that until somebody has authorization, unless they are a U.S. citizen, it's not legal for them to work in the United States. You know that, don't you?"  Ramirez responded "That's correct."  When asked whether it was correct that he "couldn't get a job in 2008 because you didn't have those papers," Ramirez responded affirmatively.  Counsel then stated that "although it's illegal for people who are not U.S. citizens or who do not have proper authorization to work, we know some people do work illegally. You know that, don't you?"  Ramirez replied yes.  Counsel further stated that "when somebody is illegal that's working, if they get caught, you understand they have to stop working.  You understand that, don't you?"  Ramirez said yes.

Counsel then asked if Ramirez had been "deported three times for illegal entry, haven't you?"  Ramirez replied that it happened twice "[m]any years ago." Counsel then asked Ramirez whether he understood that "if people are illegal and they get caught, whether they are working or not working, they can be deported. You understand that. Right?"  Ramirez agreed.  Counsel once again asked Ramirez whether he had been deported the three times he entered illegally, and Ramirez responded that it happened twice in 1975.

Counsel then asked whether Ramirez had been arrested for attempting to bring two Mexican nationals across the border.  Plaintiffs' counsel objected as to relevance, stating that it had nothing to do with whether Ramirez's civil rights were violated.  Defendants' counsel responded it was relevant as to damages "because this gentleman has to acknowledge that he understands that if an illegal person is working in this country, they can be stopped. They can be forced to stop work and be deported and, therefore, not be able to work in this country at any time, and therefore, it goes to the argument that he would have been continually gainfully employed during the period that the jury may find that he

was an illegal alien." Counsel further said it was relevant because Ramirez had testified that being in prison for the murder conviction was a terrible experience and the jury should consider that Ramirez had been in prison previously when it determines damages. The court overruled the objection, stating that Plaintiffs' counsel could rehabilitate on redirect examination.

Ramirez then agreed that he had been arrested for attempting to bring two women across the border, one of whom was his wife. Counsel then asked Ramirez whether he swore in an affidavit to the INS that he was married to Connie Ramirez, and he said yes. Defense counsel asked whether Connie Ramirez was Ramirez's wife, and Ramirez said "[n]ot legally." Ramirez denied lying under oath, again stating that he was married but not legally. Counsel asked Ramirez about an affidavit given to the INS on July 1, 1975 stating that he was born in the United States. Ramirez admitted that was his signature. Ramirez admitted that he received a six-month prison sentence for attempting to bring the two women across the border. Counsel asked Ramirez whether he had filed income tax returns and Ramirez responded that he filed them from 1990 until 1995, prior to his arrest in 1996.

On redirect, Plaintiffs' counsel offered Ramirez's permanent resident card, and Defendants' counsel objected, asserting that the date on the document was not the date Ramirez became a lawful permanent resident because "[e]verybody who got their green card, no matter when they got it, got it with that date on it through the amnesty program." Plaintiffs' counsel responded that Ramirez "has been called an illegal alien." "[I]t's been suggested that he did not have a card, if you will, during the period of time he worked." Plaintiffs' counsel further explained Ramirez has been a "resident since 1990. It expired when he was in prison. He could do nothing about it until after that, after prison. All he had to do was simply apply for the card that he has now, and for this jury not to be able to hear and see, given the cross-examination, . . . would be awfully darn

prejudicial to my client." Defendants' counsel reiterated his position that the date on the card was the same for everyone who received the card pursuant to the amnesty program and suggested that if the court called the Border Patrol, that would be confirmed. Plaintiffs' counsel responded that he would accept that if the court would strike all the testimony with respect to Ramirez being an illegal alien. The court then allowed admission of the card over Defendants' objection and suggested to Defendants' counsel that he might consider calling an immigration official to explain the date on the card in his case-in-chief.

Ramirez testified that the document in question was his permanent resident card and that it provided that he has been a lawful permanent resident since December 1, 1990. Ramirez testified that before he was arrested in 1996, he had a permanent resident card and it expired while he was in prison. After he was released, he renewed the card.

### Sifuentes's testimony

On direct examination, Sifuentes testified that he was born in Mexico. At 17 years old, he came to the United States and began working with his brother-in-law building pivots in Muleshoe, Texas. Sifuentes has been a lawful permanent resident since 1993 and has approval to live and work in the United States. Sifuentes was 23 when he was arrested for the murder of Cruz. When Sifuentes went to jail they took his wallet and personal papers, which were not returned when he was released 12 years later.

During a sidebar before the court, Plaintiffs' counsel stated that Sifuentes had entered the United States illegally in 1991 and became legal in 1993. Thus, counsel asked that any reference to his illegal entry be excluded because he was a lawful resident when arrested, and he is a lawful resident today. Counsel argued that the "only reason that such an issue would come up would be to inject bias on this jury, and we just think it's clearly unfairly prejudicial." Defense counsel responded that it is relevant "because if they were illegal, they had no

legal ability to work under the law" and the "jury can take that into consideration in terms of any claims for lost wages." The court ruled that "on the damage issues concerning earnings, it's probably relevant to pursue that." Defense counsel objected to the introduction of Sifuentes' lawful permanent resident card "because it was not produced in discovery." The court overruled the objection the same way it did the defense's objection to Ramirez's card, stating that if "you want to bring in somebody during your case-in-chief to explain or impeach that, I'll let you do it."

Direct examination of Sifuentes continued with defense counsel asking whether he had entered the country illegally in 1991. Sifuentes responded affirmatively. Sifuentes became a legal resident on February 4, 1993, as shown by his permanent resident card, which was introduced into evidence. It expires May 11, 2020.

During cross examination, defense counsel asked Sifuentes whether he had contact with the Mexican Consulate's Office, and Sifuentes indicated that he did when he was released from prison. Defense counsel then inquired as follows: "In fact, you had your picture taken for the newspaper, a picture of you with a Mexican Consulate; isn't that true?" Sifuentes responded that he did not remember. Defense counsel subsequently inquired as follows: "From the time that you came here illegally in 1991 up until the time you went to prison, you never filed a tax return reporting any income at all, did you?" Sifuentes responded that he did not remember.

### Dr. Bradley Ewing's testimony

The Plaintiffs asked for damages based on, among other things, loss of earnings capacity. The Plaintiffs called Dr. Bradley Ewing, an economics expert, to testify about the Plaintiffs' loss of earnings capacity while they were incarcerated. Dr. Ewing performed an economic loss analysis for the period of the Plaintiffs' incarceration. Dr. Ewing estimated Ramirez's earnings capacity

loss over the 12-year period to be $305,782. Because Sifuentes was a much younger worker with less experience and with less of an established work history, Dr. Ewing used information from the Bureau of Labor Statistics to calculate his earnings capacity loss, which for the same 12-year period was $214,945.

On cross examination, Abreo's defense counsel asked Dr. Ewing whether the earnings calculation took into account that Ramirez "may have not been a legal working resident of the United States during the time that he was incarcerated?" Dr. Ewing answered yes. When counsel asked whether Ramirez was legally in the United States, Plaintiffs' counsel objected based on relevance. Defense counsel responded that the question went to damages, "whether he's deported, whether he's going to be earning or not." The district court simply stated the objection was "overruled." Defense counsel continued to ask questions of the witness regarding whether his calculations considered whether Ramirez "doesn't get deported."

Ponce's defense counsel asked Dr. Ewing if he was "telling the ladies and gentleman of this jury that illegal aliens that come into this country work at the same pay scale as someone who is a legal resident?" Dr. Ewing responded that he "presume[d] that some do and some don't. But what I'm telling you is that based upon earnings capacity, these are the best estimates that an economist can come up with." Defense counsel responded: "Then I suggest you probably– would you expect– Well, you probably need to go out here in Southwest Lubbock and talk to roofing crews and see which ones have legal workers and which ones have illegal workers and compare the estimates that you get for the jobs." Plaintiffs' counsel objected to this statement as irrelevant and argumentative, and the district court sustained the objection. Defense counsel disregarded the court's ruling and asked Dr. Ewing, "Have you ever done that?" Once again Plaintiffs' counsel objected, and the court sustained the objection. Counsel next

asked the witness if he was "telling the ladies and gentleman of this jury that immigration status has nothing to do with the pay scale?" Plaintiffs objected, and the court overruled it. Dr. Ewing responded that their immigration "status doesn't have anything to do with their earnings capacity." Dr. Ewing explained that "just because they're currently earning something less for whatever reason, that does not necessarily represent their earnings capacity. That represents their expected earnings. I was asked to estimate earnings capacity."

Defense counsel for Lamb County and Mark Yarbrough subsequently inquired: "The number you have given us does not take into consideration whether either of these gentlemen have the lawful right to work in the United States. Correct?" Dr. Ewing answered: "I believe it does take that into consideration." Defense counsel later inquired whether Dr. Ewing had stated that "people who are working illegally or, as you said, unlawfully, economists think they make the same amount of money as somebody who is working legally for the same job?" Plaintiffs' counsel objected, and the district court overruled it. Defense counsel again asked whether Dr. Ewing had previously testified that "economists believe that people who are legal make the same amount of money as people who work that job illegally?" Dr. Ewing responded that that may be a mischaracterization of his testimony. Defense counsel then asked: "Your calculations do not take into consideration the potential of anybody being deported to Mexico, for example?" Dr. Ewing responded that such a factor was taken into consideration in the data. Defense counsel then asked whether "for example, over 11.7 years, you would say a fellow has an earning capacity of $305,782 –that's his earning capacity regardless of whether he's in the United States working or he's in Mexico. Right?" Dr. Ewing testified that "that's his earnings capacity." Defense counsel's next question was: "Your calculation of earning capacity would be the same whether Mr. Ramirez was working every day or whether he voluntarily or involuntarily went back to Mexico?" Dr. Ewing

No. 11-10865

again responded that that was Ramirez's earnings capacity. Defense counsel then asked the court to strike Dr. Ewing's testimony as not helpful to the jury because the expert admitted its calculation was not evidence of damages, and the district court denied the request.

At the conclusion of the 27-day trial, the court submitted the case to the jury with instructions to answer whether the Defendants had caused the Plaintiffs to suffer the following constitutional violations: wrongful arrest; unlawful detention; constitutionally unfair criminal trial; a policy of not disclosing exculpatory evidence;[6] and a policy of employing improper eyewitness identification procedures. The jury found for the Defendants on all of the Plaintiffs' claims. The district court entered a take nothing judgment in favor of the Defendants. The Plaintiffs now appeal.

## II.     ANALYSIS

The Plaintiffs contend that the district court violated Rule 403 of the Federal Rules of Evidence by allowing evidence of their immigration status because any probative value was substantially outweighed by a danger of unfair prejudice. More specifically, the Plaintiffs argue that the district court abused its discretion in allowing Defendants' counsel to elicit testimony in an attempt to show that the Plaintiffs were "illegal aliens" despite their documentary evidence demonstrating they were lawful permanent residents during the relevant time period. The relevant time period was their incarceration for the murder conviction. The Plaintiffs are seeking damages for, among other things, lost earnings during their incarceration.

### A.     Waived Objection

The Defendants contend that the Plaintiffs waived their objection because they were the first to introduce evidence of their own immigration status. As

---

[6] This claim was brought against the Defendants not before this Court on appeal.

previously set forth, six months prior to trial, Plaintiffs' counsel filed a motion to exclude evidence of any pre-arrest immigration status or history because at the time of their arrests and at trial they were lawful residents. The Plaintiffs argued that because they were lawful permanent residents at the time of their arrest in 1996, their pre-arrest illegal immigration status was completely irrelevant to the issues and had no bearing on their claim for damages based on 12 years of wrongful incarceration. Additionally, they argued that the issue of immigration status is divisive, inflammatory, and extremely prejudicial. The Defendants opposed the motion, arguing that such evidence was relevant and probative. The district court denied the motion.

Shortly before trial, Plaintiffs again filed a motion in limine to exclude evidence of their pre-arrest illegal immigration status. In that motion, Plaintiffs requested the court to instruct the Defendants to refrain from referencing the Plaintiffs' immigration status without first approaching the bench and obtaining a ruling from the district court outside the presence of the jury. Again, the Defendants opposed the motion, and the district court denied it.

The Plaintiffs assert that because the Defendants had made clear that they considered the Plaintiffs' immigration status "relevant and probative" and because the district court refused to exclude any such evidence, they had "no choice but to preemptively defend themselves at trial from any false allegations that they were illegal aliens." During trial, both Plaintiffs testified, and on direct examination, Plaintiffs' counsel elicited testimony that they were born in Mexico and that, although they illegally entered the United States, they had become lawful permanent residents prior to their arrest in 1996.

To support their contention that the introduction of evidence regarding their immigration status did not waive their objections, Plaintiffs rely on this Court's opinion in *Reyes v. Missouri Pacific Railroad Co.*, 589 F.2d 791, 793 n.2 (5th Cir. 1979). In that case, this Court rejected the defendant's claim that the

plaintiff waived any error by first introducing evidence of prior convictions during direct examination, explaining that the plaintiff "had no choice but to elicit this information on direct examination in an effort to ameliorate its prejudicial effect." *Id.*

Subsequently, however, the Supreme Court held that a "defendant who preemptively introduces evidence of a prior conviction on direct examination may not on appeal claim that the admission of such evidence was error." *Ohler v. United States*, 529 U.S. 753, 760 (2000). In *Ohler*, the district court had granted the government's motion in limine that sought to use the defendant's prior felony conviction as impeachment evidence. *Id.* at 754. In making its determination that the evidentiary objection had been waived, the Supreme Court relied on the general rule that "a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." *Id.* at 755 (citing 1 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 103.14, p. 103-30 (2d ed. 2000); 1 J. Strong, McCormick on Evidence § 55, p. 246 (5th ed. 1999)). Accordingly, the principle in *Ohler* dictates that the Plaintiffs' preemptive introduction of evidence of their illegal immigration status prior to their arrests waives any challenge to that evidence. Nonetheless, we conclude that the Plaintiffs' introduction of evidence regarding their illegal immigration status *prior* to becoming legal residents does not waive the Plaintiffs' right to challenge defense counsel's attempt to elicit testimony that they were illegally in the United States aliens" *after* their arrests.

B.    Preservation of Error

Ponce, but not Abreo, contends that the Plaintiffs failed to preserve the error by failing to move for a mistrial or requesting a specific jury instruction to address the issue.[7] Thus, Ponce argues that this issue should be reviewed for

---

[7] Ponce also states that the Plaintiffs failed to address the issue of immigration status in their "48-point motion in limine." Although the Plaintiffs did not raise the issue in that

No. 11-10865

plain error.   If a complaining party does not object at trial to the admission of the evidence, this Court reviews the evidentiary challenge on appeal only for plain error.  *See* FED. R. EVID. 103(e); *United States ex rel. Small Bus. Admin. v. Commercial Tech., Inc.*, 354 F.3d 378, 389 (5th Cir. 2003).[8]

Contrary to Ponce's assertion, the Plaintiffs did request a specific jury instruction regarding their lawful permanent resident status, and the district court denied it.[9]  In any event, we reject Ponce's contention that the Plaintiffs' failure to move for a mistrial requires plain error review.  During the trial, Plaintiffs' counsel repeatedly objected to defense counsel's questions involving Plaintiffs' illegal immigration status after their arrest.[10]  Thus, we conclude that the Plaintiffs' objections sufficiently preserved the claim.  *See* FED. R. EVID. 103(b) ("Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").

### C.    Merits of the Evidentiary Ruling

The Plaintiffs contend that the district court erred in allowing Defendants' counsel to elicit testimony in an attempt to show that the Plaintiffs were "illegal aliens" even though they were lawful permanent residents during the relevant

---

particular motion, as previously set forth, they did raise it in two other pretrial motions to exclude.

[8]  Under the plain error standard, this Court generally reverses only for "obvious and substantial errors that seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Reddin v. Robinson Prop. Gr., Ltd. P'ship,* 239 F.3d 756, 760 (5th Cir. 2001).

[9]  The Plaintiffs requested the following instruction:  "As permanent legal residents, plaintiffs are entitled to bring this action.  You may not treat them any differently nor deny them a just recovery simply because they are permanent residents rather than citizens of the United States."

[10]  Ponce points out that Plaintiffs' counsel did not object to Ramirez's mental health records which provide that he is a Mexican national.  Because the Plaintiffs first introduced evidence demonstrating they are Mexican nationals, any challenge to that evidence has been waived.  *Ohler*, 529 U.S. at 755-58.

15

time period.  In their brief, the Plaintiffs argue that the questioning was irrelevant and prejudicial.  Relevant evidence is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. FED. R. EVID. 401.  Rule 403 provides that a district court may exclude evidence, even if relevant, if its probative value is substantially outweighed by a danger of unfair prejudice.  A trial court's ruling on admissibility under Rule 403's balancing test will not be overturned on appeal absent a clear abuse of discretion. *United States v. Adcock*, 651 F.2d 338, 343 (5th Cir. Unit B Jul. 1981).

At trial, the Plaintiffs objected to the defense's line of questioning with respect to their illegal immigration status.  They argued that because they had become legal residents by the time of their arrests, such questioning could only serve to "inject bias" and be "unfairly prejudicial." The district court allowed the questioning, stating that "I think that on the damage issues concerning earnings, it's probably relevant to pursue that." At trial, defense counsel asked questions insinuating that the Plaintiffs were illegal aliens during the cross examination of three witnesses:  the two Plaintiffs, Ramirez and Sifuentes, and Dr. Bradley Ewing, the Plaintiffs' economist expert witness.

At oral argument, Plaintiffs' counsel conceded that whether the Plaintiffs were illegal aliens (and thus unauthorized to work in the United States) at the time of their arrests is relevant to the issue of damages.  However, Plaintiffs' counsel contended that the green cards conclusively proved they became lawful permanent residents prior to their arrests.  Nonetheless, Plaintiffs' counsel also conceded that defense counsel was entitled to cross examine the Plaintiffs with respect to their green cards.

The Plaintiffs rely on *Rojas v. Richardson*, 703 F.2d 186 (5th Cir. 1983), to show that comments about a party's alien status may be highly prejudicial

and require reversal.  In that case, the plaintiff Rojas had brought a negligence suit against Richardson.  *Id.* at 187.  Prior to trial, Rojas had filed a motion in limine, seeking to bar the use of testimony regarding his status as an "illegal alien."  *Id.* at 188.  The district court denied the motion.  *Id.*  Although no evidence was admitted during trial regarding Rojas's immigration status, during closing argument, defense counsel referred to him as an "illegal alien."  *Id.* at 190-91.

Because Rojas' counsel did not object to this remark, this Court reviewed the issue for plain error, opining that "allegations unsupported by the record that Rojas was an illegal alien might well have a serious and negative effect on his substantial right to an impartial jury."  *Id.* at 190.  This Court opined that "by introducing irrelevant and unproven allegations that Rojas was an illegal alien, the defense clearly was appealing to the prejudice and bias of members of the jury on the basis of national origin."  *Id.* at 191.  Although admitting evidence of Rojas's Mexican citizenship was necessary to establish diversity jurisdiction, "his status as an 'illegal' alien was completely irrelevant to the negligence claims the jury was to evaluate."  *Id.*  Ultimately, this Court held that "the obvious and blatant appeal in this case to racial and ethnic prejudice is plain error."  *Id.* at 192.  Thus, this Court reversed the district court's judgment and ordered a new trial.  *Id.*

However, on rehearing, Defendant Richardson supplemented the record with a transcript of the voir dire proceedings, which "made clear that it was made known to the prospective jurors at that time that plaintiff, Rojas, was an 'illegal alien.'"  *Rojas v. Richardson*, 713 F.2d 116, 117 (5th Cir. 1983).  Although the Court on rehearing continued to find counsel's remarks highly prejudicial and a blatant appeal to bias, in light of the revelation that the jury had knowledge of Rojas's illegal status throughout the trial, it could not find that the argument was so prejudicial as to constitute plain error.  *Id.* at 118.  The Court

then granted the motion for rehearing and affirmed the district court's judgment. *Id.* Here, the Plaintiffs urge this Court to likewise find defense counsel's admission of evidence of illegal immigration status highly prejudicial and an abuse of discretion.

The initial opinion in *Rojas* stands for the proposition that counsel's closing remarks referring to the plaintiff as an "illegal alien" rose to the level of plain error because they were "unsupported by the record" and "completely irrelevant to the negligence claims." 703 F.2d at 190, 191. The opinion on rehearing explains that because the jury had been aware of Rojas's illegal status throughout the trial, the Court could not find the attorney's remark rose to the level of plain error. *Rojas*, 713 F.2d at 117-18. Here, the Plaintiffs are not bringing an improper closing argument claim; instead, they raise a claim of evidentiary error under Rule 403. More importantly, unlike *Rojas*, in the instant case, the Plaintiffs' legal status has been conceded to be relevant to their claim for damages for loss of earning capacity while incarcerated. Thus, although *Rojas* informs us that the use of the term "illegal alien" can be highly prejudicial, we do not find *Rojas* controlling in the instant case.

### 1.    Questioning of Ramirez and Sifuentes

The Plaintiffs both testified that although they had initially entered the United States illegally, they had become lawful permanent residents prior to their arrests for murder in 1996. Over the Defendants' objection at trial, the Plaintiffs introduced into evidence their lawful permanent resident cards. Ramirez obtained his card pursuant to an amnesty program, and the card provides that it became effective on Dec. 1, 1990. Sifuentes's card provides that it became effective February 4, 1993.

The Defendants have repeatedly disputed whether Ramirez had obtained legal status by the time of his arrest because he had obtained his card through an amnesty program. Before the trial court, Defendants asserted that Ramirez

had received his green card during an amnesty program and that all green cards received under that program had the same date, December 1, 1990. Thus, the Defendants argued the card did not prove that Ramirez had become a lawful permanent resident on that date. In their brief, Plaintiffs cite the amnesty program statute that Ramirez used to obtain his green card. *See* 8 U.S.C. § 1160. Ramirez obtained his card through the Special Agricultural Workers Program, an amnesty program that Congress created as part of the Immigration Reform and Control Act of 1986. Under certain circumstances, the program provided that an alien who had been admitted for temporary residence would be admitted as a permanent resident if he applied by November 30, 1988. 8 U.S.C. § 1160(a)(1)(A); *Ortiz v. Meissner*, 179 F.3d 718, 720 (9th Cir. 1999). The statute further provided that the adjustment would occur two years after the later of the following events: (1) the date the alien was granted temporary resident status or (2) the last day of the application period. 8 U.S.C. § 1160(a)(2)(B). Based on the dates and deadlines in the amnesty statute, the Defendants' contention that Ramirez would not have had his permanent lawful resident card by the time he was arrested in 1996 seems rather implausible.[11] However, it is not apparent from the transcript that the parties were aware of this particular amnesty statute and its timeline.[12]

At trial and on appeal, defense counsel has argued that the Plaintiffs' testimony demonstrated that they did not procure their green cards until after their current counsel began assisting them in 2001, which would have been long

---

[11] Obviously, the Defendants' contention regarding the amnesty statute does not apply to Sifuentes because he did not obtain his card through the amnesty program.

[12] Defense counsel elicited testimony from Ramirez that the Texas prison system classified him as an illegal alien. Although we do not find it improper to question him about his classification in prison, we note that it is the federal government, not the State of Texas, that determines a foreign national's immigration status.

No. 11-10865

after their arrest for the murder in 1996. Our review of the record does not support defense counsel's interpretation of the Plaintiffs' testimony. Although the Plaintiffs' testimony through their interpreter is not crystal clear, a fair reading of their testimony is that their current counsel assisted the Plaintiffs in renewing their green cards after the initial cards had expired[13] while they were in prison. Ramirez testified that he "already had another card, but it expired while in the penitentiary" and that his current lawyers helped him obtain the card that he had at the instant trial. Sifuentes testified that he became a lawful permanent resident in 1993 and that his current lawyers helped him obtain the permanent resident card that was submitted at trial. Further, the Defendants' contention that current counsel assisted Ramirez in obtaining his card pursuant to the amnesty program appears untenable because the amnesty application deadline was in 1988, and current counsel began representing Ramirez in 2001.

2.      Questioning of Plaintiffs' Expert Witness Dr. Ewing

During Dr. Ewing's cross examination, defense counsel asked whether his earnings calculation for the Plaintiffs took into consideration that they may not have been legal residents at the time of their incarceration. Defense counsel further inquired whether illegal aliens are paid on the same scale as legal residents. Dr. Ewing explained that immigration status has nothing to do with earnings capacity. Defense counsel also inquired whether the earnings calculation took into account that the Plaintiffs could be deported. Dr. Ewing responded that the analysis did take into consideration this factor.

---

[13] Relying on a United States Department of Justice online press release, the Plaintiffs explain that, although a green card may expire, the legal status of the alien does not. Brief at 28 & n.3 (citing U.S. Dept. of Justice, Immigration and Naturalization Service, Questions and Answers, *available at* http://uscis.gov/files/pressrelease/GreenCardRenewal_110702.pdf (last accessed Jun. 5, 2013) ("Q. Will I lose my permanent resident status if I do not renew my Green Card? A. No, you will not lose your permanent resident status if you do not renew your Green Card—permanent resident status will not expire or change.")).

No. 11-10865

As previously set forth, at oral argument, Plaintiffs' counsel conceded that whether the Plaintiffs were illegal aliens (and thus unauthorized to work in the United States) at the time of their arrests is relevant to the issue of damages. Although the cross examination of Dr. Ewing was somewhat repetitive with respect to this issue, that occurred in part because there were three defense attorneys that questioned Dr. Ewing.[14]   It also appears that the questions regarding possible deportation are relevant to damages because lawful permanent residents can be deported.

Assuming *arguendo* that the district court erred in allowing the continued questioning of these three witnesses with respect to the Plaintiffs' "illegal" immigration status at the time of their arrests, we turn to whether the error was harmless. *Price v. Rosiek Constr. Co.*, 509 F.3d 704, 707 (5th Cir. 2007). The "evidentiary ruling will be affirmed unless the district court abused its discretion *and* a substantial right of the complaining party was affected." *Id.* (citation and internal quotation marks omitted) (emphasis added); *see* FED. R. EVID. 103(a) (requiring that the "error affects a substantial right of the party"). "An error does not affect substantial rights if the court is sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict." *Id.* at 707-08 (citation and internal quotation marks omitted).

We begin by noting that the Plaintiffs have only preserved their challenge to any testimony that was elicited regarding the Plaintiffs' illegal immigration status at the time of their arrests and subsequent incarcerations. As previously explained, any challenge to the testimony regarding their illegal immigration status prior to that time has been waived.

---

[14]  We note that the district court sustained the Plaintiff's objection to defense counsel's suggestion to Dr. Ewing that he "talk to roofing crews" to determine the difference in pay for illegal and legal residents.

No. 11-10865

With respect to Ramirez, our conclusion after reviewing the evidence is that his testimony regarding his illegal status prior to his arrest is much more damaging than any testimony elicited regarding his post-arrest status. For example, during defense counsel's cross examination of Ramirez regarding his pre-arrest immigration status, he admitted that when he was illegally in the United States, he had lied in an affidavit submitted to the INS, claiming that he had been born in the United States. Ramirez admitted that he had been sent to prison for bringing two women across the border when he was an illegal alien. Ramirez further admitted that he had represented under oath that one of the women was his wife, but that they were not legally married. Ramirez also admitted that he had been deported twice for illegally entering the United States.

On the other hand, Ramirez's testimony on cross examination with respect to the relevant time period was not very prejudicial. For example, when Ramirez was asked whether he went to prison in 1998 as an illegal alien, Ramirez responded: "No, I still had my other card." Although defense counsel attempted to elicit testimony that Ramirez was in the United States illegally at the time of his arrest and incarceration, the record reveals that Ramirez consistently testified that he had his card at the time of his arrest, it expired while he was incarcerated, and he renewed it once he was released. In any event, to the extent that the Plaintiffs are relying on defense counsel's remarks, we note the district court instructed the jury that the attorney's comments do not constitute evidence.[15]

With respect to Sifuentes, there was little testimony elicited from him regarding his immigration status. On direct examination, Sifuentes testified that he entered the country illegally in 1991 and became a legal resident in

---

[15] The court instructed the jury as follows: "Remember that any statements, objections, or arguments made by the lawyers are not evidence in the case."

22

No. 11-10865

1993, as evidenced by his permanent resident card. During cross examination, Sifuentes testified that he had contact with the Mexican Consulate's Office following his release from prison. Of course, the jury was already aware that Sifuentes was a Mexican national from his direct testimony. When asked on cross examination whether he had filed a tax return from the time he entered the United States illegally in 1991 until he was sent to prison, Sifuentes responded that he did not remember. Although there was little prejudicial testimony regarding his illegal immigration status, defense counsel was able to elicit highly prejudicial testimony from Sifuentes in which he admitted pleading guilty to assaulting his girlfriend. Defense counsel was also able to introduce evidence that Sifuentes had taken a polygraph test that indicated deception when he was questioned whether he was present when the murder victim was shot. This evidence is not challenged on appeal and is clearly prejudicial.

With respect to Dr. Ewing, although defense counsel asked questions regarding whether the Plaintiffs' immigration status would affect the earnings capacity analysis, no new prejudicial evidence was elicited. Our conclusion is supported by Plaintiffs' counsel's response at oral argument to this Court's inquiry with respect to what constituted the most damaging testimony elicited at trial. Counsel pointed to Dr. Ewing's testimony that he was not an attorney and did not know whether the Plaintiffs had legal resident status.

Moreover, our review of the record does not persuade us that the Plaintiffs made a strong case in support of their claims of constitutional violations.[16] For example, one of the Plaintiffs' claims is that they were arrested without probable

---

[16] We disagree with Plaintiffs' contention that they made a strong showing on their constitutional claims. We note that the Plaintiffs' brief makes no argument regarding the strength of their claim that the City of Littlefield had a policy of employing improper eyewitness identification procedures. In any event, the record does not support a finding that there was a persistent policy or practice that was maintained with deliberate indifference with respect to eyewitness identification procedures.

cause. Contrary to the Plaintiffs' assertion, the evidence demonstrated probable cause to arrest them. Less than an hour after the murder, a police officer stopped the Plaintiffs in their vehicle a few miles from the crime scene at about 3 o'clock in the morning because the officer thought their vehicle matched the description given by the dying murder victim. The officer let them go after stopping them. Subsequently, Ayala identified a photograph of Sifuentes, stating that he was at the murder scene a few moments before the victim was shot. Also, Janie Ramirez[17] made an unsolicited call to the police stating that Sifuentes matched the description of the murder suspect and had been at her home in Littlefield around midnight the night of the murder. Further, while being questioned about the robbery/murder, Ramirez asked the police why they thought he would steal $300 or $400 when he had a job. The evidence demonstrated that the robbers had taken nearly $300 from the store. Knowledge of these facts support the determination that there was probable cause to arrest the Plaintiffs.

Additionally, although the Plaintiffs claimed that Defendant Texas Ranger Abreo falsified his investigation report, at trial Abreo explained that he mistakenly attributed other witnesses' statements at the crime scene to Officer Thompson. However, the evidence showed that the witnesses did indeed make the statements contained in Abreo's report. In other words, the mistake Abreo made was in his representation of who had made that statement. The Plaintiffs also claimed that the testimony of Mary Davila Wood at their criminal trial was coerced. Wood's testimony at the trial in the instant suit does not support the Plaintiffs' claim of coercion. Wood testified that Abreo never asked her to lie and that she has always told law enforcement officers the truth about what happened on the night of the murder. Further, we note that, consistent with her

---

[17] She is not related to the Plaintiff Ramirez.

testimony at the criminal trial, Wood's testimony during the instant trial placed the Plaintiffs at the scene of the murder on the night in question.[18]   The Plaintiffs also relied on a memo written by the prosecutor stating that Abreo had lied to him in order to have him file the case; however, at the instant trial, the prosecutor explained that although he initially believed that Abreo lied about a witness's statement, after he read the transcript of the statement, he no longer believed that Abreo had lied to him. The Plaintiffs also claimed that the eyewitness identification procedure rendered their criminal trial unfair. However, in the criminal trial, the jury was made aware of the identification procedure used by the police.

After reviewing the entire record, we do not believe the Plaintiffs carried their burden of proving that their constitutional rights were violated during their criminal proceedings.  We note that, in a post-judgment ruling, the district judge, who presided over this 27-day trial, opined as follows: "Plaintiffs initiated this case by suing almost everyone remotely involved in the underlying criminal investigation and trials and asserted numerous claims that were either tenuous at best or even fanciful in light of established civil rights law." We further note that defense counsel made no mention of the Plaintiffs' illegal immigration status during closing arguments. *United States v. Farias-Farias*, 925 F.2d 805, 812 (5th Cir. 1991) (concluding that any error in admitting the evidence was harmless after noting, among other things, that opposing counsel did not mention the challenged evidence in closing argument).  In sum, in view of the more prejudicial evidence that is either waived or not challenged and the weakness of the Plaintiffs' case, we do not believe that the challenged evidence affected the Plaintiffs' substantial rights.  Accordingly, we are persuaded that

---

[18]   We, of course, express no opinion with respect to the innocence or guilt of the Plaintiffs as that is not before us on appeal.

any error "had but a very slight effect on [the jury's] verdict." *Price*, 509 F.3d at 708.

That said, we feel compelled to express our disapproval of defense counsel's cross-examination of the witnesses with respect to whether the Plaintiffs were legal residents at the time of their arrest even after the Plaintiffs' lawful permanent resident cards had been admitted into evidence. It appears that counsel proceeded with this line of questioning in an attempt to mislead the jurors regarding the Plaintiffs' immigration status. Nonetheless, as explained above, our review of the record convinces us that any error that was not waived was harmless.

III.   CONCLUSION

For all the above reasons, the district court's judgment is AFFIRMED.